AO 91 (Rev. 11/82)

**ORIGINAL**

**CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>YANNICK MAI, GHISLAINE TAOAHERE COUPEL-GERMAIN, and TEHEA MAI | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**17-1494M**<br><br>FILED CLERK, U.S. DISTRICT COURT<br>JUN 12 2017 |

Complaint for violations of Title 21, United States Code, Sections §§ 841(a)(1) and (b)(1)(A)(viii)

| NAME OF MAGISTRATE JUDGE | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>June 10, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii)]

On or about June 10, 2017, in Los Angeles County, within the Central District of California, defendants YANNICK MAI, GHISLAINE TAOAHERE COUPEL-GERMAIN, and TEHEA MAI knowingly and intentionally possessed with intent to distribute at least five hundred grams, that is, approximately 3,720 grams, of a mixture and substance containing a detectable amount of methamphetamine, a Schedule I narcotic drug controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**Michael Ou**<br>OFFICIAL TITLE<br>Special Agent, DHS, HSI |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<br><br>ALKA SAGAR | DATE<br>June 12, 2017 |
|---|---|

SAUSA Peter Hardin ext. 3314    REC: Detention

**AFFIDAVIT**

I, Michael R. Ou, being duly sworn, hereby declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit seeks:

    a. A criminal complaint against for Yannick Mai ("MAI"), Tehea Mai ("TEHEA"), and Ghislaine Taoahere Coupel-Germain ("COUPEL-GERMAIN") (the "TARGETS") for possession with intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of Title 21, United States, Section 841(a)(1), (b)(1)(A)(viii).

    b. An application for a warrant to search the following digital devices seized from the TARGETS on June 10, 2017, as described more fully in Attachment A, which is incorporated by reference:

        i. MOBILE PHONE #1: an Apple iPhone 6, model A1524, bearing International Mobile Enterprise Identification Number ("IMEIN") 3547806777087, found in MAI's possession at the time of his arrest;

        ii. MOBILE PHONE #2: a Huawei P10 Smartphone, Model VTR-L29, bearing IMEIN 862790031308607, found in MAI's possession at the time of his arrest;

1

iii. MOBILE PHONE #3: a LG Phoenix 2 Smartphone Model K377, bearing IMEIN 354885071723387, found in MAI's possession at the time of his arrest;

iv. MOBILE PHONE #4: a Samsung Galaxy A5, model A520F, bearing IMEIN 357661083699858, found in TEHEA's possession at the time of her arrest;

v. MOBILE PHONE #5: an Apple iPhone 7 Plus, model A1661, IMEI 359172070347418, found in COUPEL-GERMAIN's possession at the time of her arrest; and

vi. LAPTOP #1: a Sony Vaio laptop computer, model SVF152C29M, bearing serial number 54584225001011, found in MAI's possession of at the time of his arrest (collectively, "the DEVICES").

2. The requested warrant seeks authorization to search for and seize evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of controlled substances), 846 (conspiracy), and 953 (exportation of controlled substances), as described further in Attachment B, which is also incorporated by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses. This affidavit is intended to show merely that there

2

INSTRUMENTALITY PROTOCOL

is sufficient probable cause for the requested arrest warrant and criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR SPECIAL AGENT MICHAEL OU

4. I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been so employed since August 2006. Prior to my current position, I was employed as a Customs Officer with the DHS, U.S. Customs and Border Protection ("CBP") for approximately one year. I am currently assigned to the HSI Los Angeles International Airport ("LAX") Group 4. As an agent and a member of this group, I investigate violations related to money laundering, structuring, bulk cash smuggling, the importation of counterfeit financial instruments and drug smuggling. I have received additional training in the areas of arrest procedures, the execution of searches and seizures, and various other criminal laws and legal procedures, including money laundering techniques and complex conspiracies. I have participated in numerous investigations into money laundering, structuring, the importation of counterfeit financial instruments and the smuggling of narcotics. In conducting these investigations, I have utilized a variety of investigative

3

INSTRUMENTALITY PROTOCOL

techniques and resources, including but not limited to surveillance, confidential source debriefings, and telephone toll analysis.

### III. SUMMARY OF PROBABLE CAUSE

5. On June 10, 2017, MAI was stopped at a Transportation Security Administration ("TSA") checkpoint at the Tom Bradley International Terminal ("TBIT") at LAX with approximately 1,714 grams of suspected methamphetamine concealed in the groin area of his pants. MAI was en route from LAX to Tahiti.

6. MAI's daughter, TEHEA, and MAI's friend, COUPEL-GERMAIN, both of whom were travelling with MAI, were removed from the flight to Tahiti. TEHEA had approximately 952 grams of methamphetamine in her carry-on backpack, and COUPEL-GERMAIN had approximately 1,043 grams of methamphetamine in her carry-on backpack and approximately 18.14 grams of methamphetamine concealed in the groin area of her pants. MAI and COUPEL-GERMAIN later confessed to attempting to smuggle the methamphetamine out of the United States to Tahiti, where they planned to sell it.

### IV. STATEMENT OF PROBABLE CAUSE

Based on my conversations with LAX Police ("LAXPD") officers and my own investigation in this case, I know the following facts.

INSTRUMENTALITY PROTOCOL

### A. MAI is Stopped With Methamphetamine in his Pants

7.  On June 10, 2017, LAXPD Police Officer Chan told me that, during passenger screening at a TSA security checkpoint at Tom Bradley International Terminal ("TBIT"), TSA Officers discovered an anomaly in MAI's groin area after he passed through the screening machine. Upon conducting a pat-down of MAI, TSA officers discovered two clear plastic packages, weighing approximately 1,714 grams, containing a white powdery substance concealed in the groin area of MAI's pants. TSA officers detained MAI and contacted LAXPD for further investigation.

8.  LAXPD Officer Chan responded to the checkpoint area and spoke to MAI. When asked about the packages found in his pants, MAI said that before entering the security screening area, an unidentified male approached him near the ticketing area and asked him three times to carry the two package to Tahiti for him. MAI told LAXPD Officers that he declined the unidentified male's request the first two times but then agreed to carry the packages. MAI told LAXPD officers that he was traveling with a large tour group, but said that no one in the group saw the unidentified male except for him.

9.  Officer Chan learned from looking at MAI's ticketing information that he was traveling to Tahiti on Air France flight number 76. Upon speaking with Air France personnel, LAXPD

officers learned that MAI was traveling with several relatives, including his daughter, TEHEA, and other co-travelers in a tour group.

### B. CBP Officers Finds Methamphetamine in the Carry-on Luggage Belonging to TEHEA and COUPEL-GERMAIN

10. LAXPD officers told me that they went to the gate where passengers were waiting to board Air France flight number 76, contacted TEHEA, and escorted her with her bags back to the TSA screening checkpoint.

11. LAXPD Officer Holcomb told me that upon arriving at the gate, he saw TEHEA hand a teal backpack to a male passenger nearby.

12. CBP Watch Commander James Hawkins told me that he ordered all of the people traveling in MAI's tour group off the flight for secondary baggage examinations and I told Supervisory CBP Officer Ian Waite to look for the teal backpack.

13. Officer Waite told me that while conducting secondary baggage examinations, CPB officers found the teal backpack in the possession of Therese Tuhoe ("Tuhoe"). When CBP officers questioned Tuhoe, she said that the teal backpack in her possession was not hers.

14. I then saw a CBP officer carry the teal backpack to TEHEA, who was seated several feet away from Tuhoe in the large

6

room in which the secondary baggage examinations were taking place. TEHEA acknowledged that the backpack belonged to her. CBP Officer Alberty searched the backpack and discovered that it contained two clear plastic packages weighing approximately 952 grams. Insider the clear plastic packages was a white powdery substance, which field tested positive for methamphetamine.

15. Watch Commander Hawkins told me that shortly thereafter, still in the process of conducting secondary baggage examinations, CBP Officer Rector searched a blue backpack that COUPEL-GERMAIN was carrying and discovered two clear plastic packages, with a combined weight of approximately 1,052 grams, containing a white powdery substance, which field tested positive for methamphetamine. CBP Officer Lee conducted a pat-down of COUPEL-GERMAIN and discovered in the groin area of her pants a clear plastic bag containing approximately 181 grams of a white powdery substance, which field tested positive for methamphetamine.

### C. Interview of MAI

16. On June 11, 2017, at approximately 3:09 am, LAXPD Detective Shin and I interviewed MAI. Prior to questioning, I advised MAI of his <u>Miranda</u> rights verbally and in writing. MAI waived his rights and signed an ICE Statement of Rights Form 73-025. During the interview, MAI said the following:

   a. MAI initially said that he did not know what the two packages concealed in his groin area contained and that he accepted the two packages from an unknown male on the curb in front of TBIT.

   b. MAI later admitted that he knew that he was carrying "ice," which, based on my training and experience, I know to be a slang term for methamphetamine.

   c. MAI said that an individual nicknamed "El Chapo" had given him money the last time he was in Tahiti to bring to the U.S. to purchase methamphetamine and return with it to Tahiti.

   d. MAI said that he knew it was illegal to possess the methamphetamine.

   e. MAI said that while staying at the Days Inn Hotel in Buena Park, California, an unknown Hispanic male called him on one of his cell phones and dropped off the methamphetamine to him in the parking lot of the Days Inn.

   f. MAI said that he put two packages of methamphetamine inside TEHEA's backpack without her knowledge.

   g. MAI said that he was told that he would be paid approximately $20,000 in exchange for transporting the methamphetamine to Tahiti.

8

INSTRUMENTALITY PROTOCOL

17. MAI elected to write out a written statement explaining the entire incident and signed a consent to search form for his cellular phones.

### D. Interview of TEHEA

18. On June 11, 2017, at approximate 5:12 am, Detective Shin and I interviewed TEHEA. Present during questioning was Air France Supervisor Marine Chakma ("Chakma") for French translation. Prior to questioning, I advised TEHEA of her Miranda rights verbally and in writing in English, which Chakma translated into French. TEHEA waived her rights and signed an ICE Statement of Rights Form 73-025. During the interview, TEHEA said the following:

    a. TEHEA denied knowing about the drugs in her teal backpack and said that someone must have placed them there without her knowledge.

    b. TEHEA said that while in a restroom at LAX, she placed the backpack on the floor in front of her but did not have a full view of the backpack and that it was possible that someone may have put the methamphetamine in her backpack while she was using the toilet.

    c. TEHEA initially said that when she realized she was not going to be allowed to board the flight, she gave her teal backpack to Tuhoe.

9

19. TEHEA signed a consent to search form for her cellular phone.

D. Interview of COUPEL-GERMAIN

20. On June 11, 2017 at approximately 7:04 am, LAXPD Detective Jin Shin and I interviewed COUPEL-GERMAIN regarding the suspected methamphetamine. Chakma was present during questioning for French translation. Prior to questioning, I advised COUPEL-GERMAIN of her Miranda rights verbally and in writing in English, which Chakma translated into French. COUPEL-GERMAIN waived her rights and signed an ICE Statement of Rights Form 73-025. During the interview, COUPEL-GERMAIN said the following:

   a. COUPEL-GERMAIN said that she stayed in the same hotel room as MAI at the Days Inn hotel in Buena Park, California, the night before their flight.

   b. COUPEL-GERMAIN admitted that she knew that her blue backpack contained two packages containing methamphetamine and that she knew the package found in her groin area also contained methamphetamine.

21. COUPEL-GERMAIN elected to write a statement explaining the entire incident and signed a consent to search form for her cellular phone.

### V. Training and Experience Regarding DRUG TRAFFICKING

22. Based on my training, personal experience, and the collective experiences related to me by other HSI agents who specialize in drug trafficking investigations, I know the following:

    a. Drug traffickers use mobile phones to conduct drug trafficking operations, including communicating with suppliers, customers, and co-conspirators by phone, text message, e-mail, and social media. Drug traffickers generally do not conduct transactions for large amounts without first communicating matters such as quantity, price, arrival time, and meet location, often through a telephone or mobile devices such as the DEVICES. Further, drug traffickers will also use text messages to send photographs as codes or actual pictures of the contraband being trafficked as part of drug transactions.

    b. The distribution of drugs is a continuing criminal activity that occurs over months and often years. Persons who are involved in drug trafficking often maintain evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in drug trafficking activities.

    c. Drug traffickers often maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the cultivation/manufacture, transportation,

ordering, sale and distribution of illegal controlled substances. These individuals commonly "front" (provide illegal controlled substances on consignment) drugs and other controlled substances to their clients and, thus, keep records or communication concerning monies owed. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as the drug traffickers' cellular phones, smart phones, and other digital devices.

       d.   Drug traffickers maintain telephone and address books, telephone bills, and records that reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization and customers. Such records are often maintained in electronic form on their cellular phones, smart phones, and other digital devices.

## VI. TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES

23. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

       a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital

devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

  b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

  c. While it is difficult to estimate the precise storage space contained on the DEVICES prior to conducting any kind of examination, based on my training and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I believe that the DEVICES contains at least one gigabyte of storage space. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

  d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires

specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

   e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals,

15

the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

   g. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

24. Based on the foregoing, there is probable to believe that the Targets possessed with intent to distribute at least 500 grams of a mixture and substance containing at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, in violation of Title 21, United States, Section 841(a)(1), (b)(1)(A)(viii).

25. Furthermore, there is probable cause to believe that the evidence, fruits, and instrumentalities of the offenses described in Attachment B will be found on the digital devices described in Attachment A.

_____
Michael R. Ou
Special Agent, HSI

Subscribed to and sworn to
before me this 12th day of June 2017,

_____
UNITED STATES MAGISTRATE JUDGE

17

INSTRUMENTALITY PROTOCOL